IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MISTY D. HUFFINE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 2:16-cv-01705-RCM |
| v. | ) |
| | ) Magistrate Judge Robert C. Mitchell |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) Docket Nos. 14 & 18 |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION[1]

**I.** **Introduction**

Misty Huffine ("Petitioner") contends that the Commissioner of Social Security ("Commissioner") incorrectly determined that she was not disabled because Administrative Law Judge Karl Alexander ("ALJ") did not give adequate weight to the medical opinion of her treating psychiatrist as compared to the contrary medical opinions of state consultative examiners when determining her mental residual functional capacity ("RFC"). The Commissioner responds that substantial evidence supports the ALJ's decision to give less weight to Petitioner's treating psychiatrist because the psychiatrist's medical opinion with respect to Petitioner's mental RFC did not comport with other evidence in Petitioner's medical record.

Presently before the Court for disposition are cross motions for summary judgment. (Docket Nos. 14, 18). Upon considering the parties' briefs, Petitioner's medical record, and applicable law, the Court will: deny Petitioner's motion for summary judgment (Docket No. 14); grant the Commissioner's motion for summary judgment (Docket No. 18); and affirm the Commissioner's determination that Petitioner is not disabled. (R. 1, 36.)

---

[1] The parties fully consented to proceed before the undersigned. (Docket Nos. 10–11.)

## II. Review of Record and Legal Standards

Petitioner protectively filed an application for Supplemental Security Income ("SSI") payments on June 5, 2013, under Section 1614(a)(3)(A) of the Social Security Act ("Act"). (R. 41, 103.) Her application was initially denied on August 15, 2013. (R. 103.) She then sought a hearing, which was set for February 27, 2015, before ALJ Karl Alexander. (R. 113, 123, 127.) Petitioner, her counsel, and impartial vocational expert Linda Dezack ("VE") attended the hearing. (R. 15.) The ALJ held that Petitioner was not disabled. (R. 36.) Petitioner sought review of the ALJ's decision by the Social Security Administration ("SSA") Appeals Council. (R. 7.) The Appeals Council denied Petitioner's request for review in mid-September 2016, instating the ALJ's decision as the Commissioner's decision. (R. 1.) Petitioner filed this action in mid-November 2016 under 42 U.S.C. § 405(g), seeking review of the Commissioner's decision. (Docket No. 3.)

In reviewing an administrative determination of the Commissioner, the question before any court is whether there is substantial evidence in the agency record to support the findings of the Commissioner that Petitioner did not sustain her burden of demonstrating that she was disabled within the meaning of the Act. Richardson v. Perales, 402 U.S. 389 (1971); Adorno v. Shalala, 40 F.3d 43 (3d Cir. 1994).

42 U.S.C. § 405(g) provides that:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson, 402 U.S.

at 401; (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999).

Because Petitioner and the Commissioner limited their arguments on appeal to whether Petitioner is disabled due to mental-health issues (Docket Nos. 15, 19–20), the Court will focus on the record relevant to those issues.

Petitioner appeared with counsel at the hearing held on February 27, 2015. (R. 15.) Petitioner described her mental condition as "[c]onstantly depressed . . . I have a lot of anxiety" and does not leave her house often. (R. 26.) She does not like "to be around people" and exits her home only to "take the kids to the doctor's or something." (R. 26.) She confirmed that it is painful for her to leave her home. (R. 26.) As for her ability "to get things done," petitioner noted she had no energy, could not lift laundry baskets, and that her kids had to help her. (R. 27.) She also testified that she struggles with concentrating and finishing tasks. (R. 27–28.) When she began discussing her pain from carpel tunnel, she became emotional. (R. 28) (Petitioner's counsel remarked "now these crying spells, is that . . . happening a lot?") Petitioner "cr[ies] every day" and her emotional state can swing from being "in a good mood" to "depressed" in the next second. (R. 28.) To help manage her mental and emotional issues, she sees a therapist twice a month and consults with her psychiatrist, Dr. Brinkley. (R. 29.) She attributes her mental and emotional issues to "chronic pain." (R. 29.)

After Petitioner's testimony concluded, the ALJ focused on whether she could work. Petitioner did not have past relevant work. (R. 20.) The ALJ posed the following hypothetical to the VE:

> assume a hypothetical individual of the Claimant's age, educational background, and work history such as it is, who would be able to perform a range of sedentary work.

3

> Would require a sit/stand option in the form of being able to change positions about every hour for three to four minutes without breaking task. Could perform postural movements occasionally, except could not climb ladders, ropes, or scaffolds.
>
> Should not do any frequent or repetitive neck movements, and no more than occasional overhead lifting or reaching. Should have no concentrated exposure to temperature extremes, wet or humid conditions, vibrations, or environmental pollutants, and no exposure to hazards.
>
> Should work in a low stress environment, with no production line or assembly line type of pace, no independent decisionmaking responsibilities, and minimal changes in the daily work routine. Would be limited to unskilled work, involving only routine and repetitive instructions and tasks; and should have no interaction with co-workers and supervisors.
>
> Would there be any work in the regional or national economy that such a person could perform?

(R. 31–32.) The VE answered that Petitioner could perform three sedentary jobs: addresser, document preparer, and glass waxer. (R. 32.) The ALJ did not ask the VE any more questions. (R. 33.) Petitioner's counsel did.

Petitioner's counsel asked the VE about the impact to the hypothetical if she "factor[ed] in that the individual is seriously limited in the ability to use judgment, relate to co-workers, interact with supervisors, deal with work stresses, and maintain attention and concentration . . . ." (R. 33.) Petitioner's attorney highlighted exhibit B-16-F, which was produced by Petitioner's psychiatrist Dr. Brinkley, to the VE. (R. 33.) The exhibit defined a serious limit as "the ability to function . . . is unsatisfactory, but not precluded." (R. 33.) Considering the attorney's changes to the original hypothetical, the VE replied that the subject individual could not be employed at full-time status. (R. 33.)

Petitioner's counsel also created a new hypothetical for the VE. In it, she asked the VE to assume "a hypothetical individual of the Claimant's age, education, past work experience,

4

with exclusively the limitation that there are frequent deficiencies of concentration, persistence, or pace, resulting from failure to complete tasks in a timely manner." (R. 33.) Frequent is defined as "two-thirds of the day." (R. 34.) Those parameters' impact would preclude any competitive employment for that individual, according to the VE. (R. 34.) The typical workplace tolerance for an employee being off task is "ten percent of the time, or six minutes of [sixty]." (R. 34.)

The issue before the Court is whether there is substantial evidence supporting the Commissioner's finding that Petitioner is not disabled. The term "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. § 423(d)(2)(A) provides the requirements for a disability determination:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would he hired if he applied for work. For purposes of the preceding sentence . . . "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). These provisions are also applied for purposes of establishing a period of disability. 42 U.S.C. § 416(i)(2)(A). While

5

some regard these provisions as "very harsh," the courts must follow them. NLRB v. Staiman Bros., 466 F.2d 564 (3d Cir. 1972); Choratch v. Finch, 438 F.2d 342 (3d Cir. 1971); Woods v. Finch, 428 F.2d 469 (3d Cir. 1970).

On December 20, 2012, Dr. Brinkley observed that Petitioner had a fairly depressed affect but demonstrated strong speech, good eye contact, intact orientation, memory, and cognition, and no suicidal or homicidal ideation. (R. 474.) Her symptoms improved after she used Ambien for sleep aid and Cymbalta for anxiety. (R. 474.) Dr. Brinkley diagnosed Petitioner with (1) a mood disorder (depression) secondary to chronic pain and (2) agoraphobia. (R. 474.)

Petitioner attended an April 2, 2013 appointment with Dr. Brinkley, in which he assessed Petitioner's mental ability to perform work-related activities. (R. 639–43.) Dr. Brinkley checked boxes indicating that Petitioner was seriously limited in her ability to use judgment, relate to co-workers, interact with supervisors, deal with work stresses, and maintain attention/concentration. (R. 639.) The form defined "seriously limited" as "[a]bility to function in this area is unsatisfactory, but not precluded." (R. 639.) Supporting his reasoning, Dr. Brinkley stated that Petitioner's mood disturbances decrease concentration, which makes work relationships difficult, and she struggles to leave her home due to anxiety. (R. 640.) He also rated Petitioner as seriously limited in understanding, remembering, and carrying out complex job instructions due to anxiety and poor self-esteem caused by depression and anxiety disorder. (R. 640.) As for Petitioner's ability to make personal-social adjustments, she is seriously limited in maintaining her personal appearance, relating predictably in social situations, and demonstrating reliability. (R. 640.) Dr. Brinkley attributes this to changes in Petitioner's anxiety level and moods, which create unpredictable behaviors and the frequent need for

absences from work. (R. 641.) Finally, Dr. Brinkley indicated through checkmarks that Petitioner has moderate restriction in daily living activities, marked difficulty in maintaining social functioning, frequent concentration, persistence of pace deficiencies affecting her ability to timely complete tasks in work settings or elsewhere, and one or two deterioration or decompensation episodes in work or work-like settings. (R. 643.)

Petitioner visited Dr. Leonida near the end of April 2014. (R. 791.) Dr. Leonida noted that: Petitioner's anxiety and mood were stable; she had not met with psychiatrist Dr. Brinkley for six months; and she had not taken medicine (likely for her mental health issues) since her last appointment with Dr. Brinkley. (R. 791.) Petitioner's mood and affect were normal. (R. 793.) Dr. Leonida told petitioner to make an appointment with Dr. Brinkley to restart her medications. (R. 794).

In records from a December 29, 2014 visit, Dr. Brinkley wrote that Petitioner was cooperative, spoke at a slow rate but with a normal amount of speech, was goal-oriented, demonstrated logical thoughts, was tearful and frustrated with her anxiety level, and did not demonstrate suicidal or homicidal ideation or evidence of hallucinations or delusions. (R. 667.)

In reviewing a disability claim, in addition to considering the medical and vocational evidence, the Commissioner must consider subjective symptoms. Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974). As the court stated in Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971):

> Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course, the claimant satisfies the requisite burden of proof.

In Good v. Weinberger, 389 F. Supp. 350, 353 (W.D. Pa. 1975), the court stated:

> Bittel seeks to help those claimants with cases that so often fall within the spirit—but not the letter—of the Act. That plaintiff did

> not satisfy the factfinder in this regard, so long as proper criteria
> were used, is not for us to question.

The applicable regulations require more explicit findings concerning the various vocational facts which the Act requires to be considered in making findings of disability in some cases. The regulations, published at 20 C.F.R. §§ 404.1501, et seq., set forth an orderly and logical sequential process for evaluating all disability claims. In this sequence, the ALJ must first decide whether Petitioner is engaging in substantial gainful activity. If not, then the severity of her impairments must be considered. If the impairments are severe, then it must be determined whether she meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability. If the impairments do not meet or equal the Listings, then it must be ascertained whether she can do her past relevant work. If not, then her RFC must be ascertained, considering all the medical evidence in the file. The finding of RFC is the key to the remainder of findings, including whether Petitioner can resume any past relevant work. If not, the ALJ must assess whether Petitioner can perform any work corresponding with her RFC in the national economy. At that stage, the Commissioner has a burden going forward to provide evidence of jobs in the national economy that would be suitable for Petitioner.

The ALJ analyzed Petitioner's disability claim using the standard five-step method. He first determined that Petitioner had not engaged in substantial gainful activity since she applied for SSI on June 5, 2013. (R. 41.) Second, he found that Petitioner had the following severe impairments: "degenerative disk disease of the cervical spine and chronic neck strain, myofascial trapezius pain; carpal tunnel syndrome of the right upper extremity; fibromyalgia; obstructive and restrictive lung disease; asthma and emphysema; migraine disorder; and anxiety disorder." (R. 41.) Third, Petitioner's impairments or combination of impairments does not meet or

8

medically equal the severity of a listed impairment. (R. 42.) The ALJ then determined Petitioner's RFC:

> The claimant . . . [can] perform sedentary work as defined in 20 CFR 416.967(a) except that the claimant requires a sit-stand option, permitting her to change positions about every four for three to four minutes without breaking task; can perform postural movements occasionally except cannot climb ladders, ropes or scaffolds; should not do any frequent or repetitive neck movements; should not do more than occasional overhead reaching; should have no concentrated exposure to temperature extremes, wet or humid conditions, vibrations or environmental pollutants; should have no exposure to hazards; should work in a low-stress environment with no production line or assembly line type of pace, no independent decision making responsibilities and minimal changes in the work routine; is limited to unskilled work requiring only routine, repetitive instructions and tasks; and should have no interaction with the general public and no more than occasional interaction with co-workers and supervisors.

(R. 45.)

Focusing on Petitioner's mental-health conditions, the ALJ noted Petitioner's claims that: she leaves her house only for doctor's appointments; she struggles to concentrate or remember things due to depression and pain, which prevent her from finishing tasks; she suffers from crying spells that occur at random; and her doctors believe her depression substantially stems from chronic pain. (R. 46.) The ALJ acknowledged that Petitioner's medically determinable impairments could reasonably be expected to cause some of her symptoms but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 46.) He justified his conclusion in two primary ways.

First, he generally attacked Petitioner's credibility by citing to what he surmised as exaggerated pain claims. (R. 48.) For example, Petitioner went to the emergency room in September 2011 for a stubbed toe and claimed that it caused a pain level of nine out of ten; she walked out of the emergency room after receiving medication. (R. 325, 328.) In an emergency

9

room visit in April 2011, Petitioner reported her pain as a ten out of ten for constipation. (R. 336, 339.) The ALJ also cited Petitioner's pain rating of a two-centimeter scalp cut as a ten out of ten after passing out, falling, and hitting her head. (R. 764, 766, 770.) These pain ratings from "relatively innocuous conditions largely discredit[] her . . . grave allegations of pain arising from her . . . impairments." (R. 48.)

Second, the ALJ pointed to medical evidence showing that Petitioner's depression, anxiety, and agoraphobia-related symptoms were controlled or controllable such that she could work. Records from an April 2014 visit with Dr. Leonida indicate that Petitioner's mood was stable even though she had not seen Dr. Brinkley, her psychiatrist, or taken her medications since her last visit with him six months prior. (R. 791.) Dr. Brinkley noted in a December 2012 visit that Petitioner was "experiencing some anxiety but this is better with the Cymbalta." (R. 474.) The ALJ noted Petitioner "does not like crowds" and modified her RFC to preclude "public contact jobs." (R. 48.) He also stated that "when the claimant takes her prescribed medication, her conditions would not preclude the very limited mental demands" of the RFC. (R. 48.)

The ALJ ascribed more weight to the findings of state agency medical consultants than treating psychiatrist Dr. Brinkley. (R. 44.) The state consultants' reports "were helpful and persuasive in establishing that the claimant is not nearly as limited as she alleges" and their medical opinions are supported by "objective evidence, the claimant's allegations and the treating sources' notes." (R. 49.) Dr. Brinkley's findings, particularly regarding Petitioner's mental RFC, "are not consistent with the treatment records or the claimant's activities of daily living and are outweighed by the unanimous conclusions of the [state] consultants, who are experienced in application of this agency's policies." (R. 49.) He also felt that Dr. Brinkley relied "too heavily on the claimant's subjective, unverifiable allegations, and are not consistent

with her documented ability to shop independently, drive and transport her children. (R. 44.) The ALJ also criticized Dr. Brinkley's reliance on GAF scores because they "are essentially based completely on the claimant's subjective complaints and other statements at that particular time" and are then "subjectively processed through the evaluator's own individual mindset," which could lead to inaccuracies and inconsistencies. (R. 44–45.) He gave Dr. Brinkley's GAF scores little weight and concluded that they, along with "Dr. Brinkley's other opinions, are not supported by objective findings and are inconsistent with the claimant's documented activities of daily living." (R. 45.)

In the fourth step, the ALJ found that Petitioner had no past relevant work. (R. 49.) This allowed the ALJ to advance to step five, in which he held that the VE correctly determined that Petitioner could work in the national economy as an addresser, document preparer, or glass waxer. (R. 50.) The ALJ concluded that Petitioner was not disabled. (R. 50.)

## III. Discussion

Distilled to its essence, this appeal concerns whether substantial evidence supports the ALJ's decision to give more weight to the state agency consulting physicians' medical opinion than Dr. Brinkley's medical opinion in determining Petitioner's mental RFC. (Docket Nos. 15 at 2; 19 at 7). Several core principles in the social-security-disability realm guide a review of the ALJ's (or the Commissioner's) decision below. "The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011); 20 C.F.R. § 416.927(d)(1–2). It is the ALJ's obligation to weigh the medical record and choose between conflicting accounts; district courts must defer to the ALJ's findings of fact that are supported by substantial evidence. Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir. 1992). "[T]he opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Brown v.

Astrue, 649 F.3d 193, 196 n.2 (3d Cir. 2011). "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." Plummer, 186 F.3d at 429 (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1984)). But ALJs "cannot reject evidence for no reason or the wrong reason." Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981). Nor may reviewing courts affirm the Commissioner's decision denying a Social Security disability claim on a ground not relied upon by the Commissioner. Fargnoli v. Halter, 247 F.3d 34, 44 n.7 (3d Cir. 2001).

The ALJ properly determined that evidence in the medical record contradicted Dr. Brinkley's medical opinion that Petitioner is seriously limited in her ability to use judgment, relate to co-workers, interact with supervisors, deal with work stresses, maintain attention/concentration, understand, remember, and carry out complex job instructions, maintain her personal appearance, relate predictably in social situations, and demonstrate reliability. (R. 49, 639–40.) In doing so, he cited records from Petitioner's April 2014 visit with Dr. Leonida showing that Petitioner's mood was stable even though she had not seen Dr. Brinkley or taken her medications since her last visit with him six months before. (R. 48, 791.) The ALJ also pointed to notes from Petitioner's December 2012 visit with Dr. Brinkley in which Dr. Brinkley indicated that Petitioner was "experiencing some anxiety but this is better with the Cymbalta." (R. 48, 474.) After describing these documents, the ALJ concluded that "when the claimant takes her prescribed medication, her conditions would not preclude the very limited mental demands" of the RFC. (R. 48.)

The ALJ's doubt of Dr. Brinkley's medical opinion is tenable considering that a reasonable mind could accept that Petitioner's mental health significantly improved in the time

between Dr. Brinkley's April 2, 2013 negative mental-health assessment of Petitioner to Petitioner's more positive visit with Dr. Leonida a year later. Consol. Edison, 305 U.S. at 229; Richardson, 402 U.S. at 401; (R. 637, 639–43, 791.) The ALJ demonstrated his choice to diminish Dr. Brinkley's medical opinion on the basis of contradictory medical evidence by writing that Dr. Brinkley's findings: "are not consistent with the treatment records . . . ." (R. 49.) Because a treating physician's medical opinion may be dismissed if other medical record evidence contradicts it, Plummer, 186 F.3d at 429 (citing Newhouse, 753 F.2d at 286), the ALJ had a legally adequate basis to give less weight to Dr. Brinkley's opinion.

When an ALJ does not give controlling weight to a treating physician's opinion, SSA regulations provide a factor test for ALJs to follow when considering the weight to ascribe to medical opinions. 20 C.F.R. § 416.927(c). These factors are: (1) examining relationship; (2) treatment relationship; (i) length of the treatment relationship and frequency of examination; (ii) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; (6) other factors. Id. Although the ALJ did not explicitly spell out all of these factors in his decision, his decision is detailed enough for this Court to meaningfully review it. See Laverde v. Colvin, No. 14-1242, 2015 WL 5559984, at *6 n.3 (W.D. Pa. Sept. 21, 2015) (dismissing the notion that an ALJ needs to "explicitly list" and discuss factors in a regulation and instead requiring that an ALJ need only explain his evaluation of the medical evidence for the district court to meaningfully review whether his reasoning accords with the regulation's standards).

The ALJ ascribed more weight to the state agency physicians' medical determinations than Dr. Brinkley's findings in a proper manner. "State agent opinions merit significant consideration" due to the agents' expertise in the social security disability programs. Chandler,

667 F.3d at 361 (citing SSR 06-6p). ALJs must "consider any existing State consultant reports." Chandler, 667 F.3d at 362 (citing 20 C.F.R. §§ 404.1519, 404.1527(f)). "Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." Chandler, 667 F.3d at 361. State consultative examiners Dr. Melissa Diorio and Dr. Monica Yeater concurred that Petitioner could handle a work schedule, maintain a consistent pace, make simple decisions, execute simple and short instructions, and behave in a socially appropriate manner despite her mental-health issues (R. 75–76, 88–89.) The ALJ noted both the consistency of the state consultants' reports (they had "unanimous conclusions") and their specialization in mental health (both possess Psy.D. degrees) when explaining why he gave their findings great weight. (R. 44, 75–76, 88–89.) His reasons for doing so are acceptable under SSA regulations. 20 C.F.R. § 416.927(c).

Throughout his decision, the ALJ adequately explained why he discounted Dr. Brinkley's medical opinion in accordance with 20 C.F.R. § 416.927(c). The ALJ acknowledged Dr. Brinkley's specialist status and his treating relationship with Petitioner. (R. 43–45.) Dr. Brinkley's records regarding Petitioner, cited by the ALJ, spanned from December 2012 to December 29, 2014, showing that the ALJ comprehended the length and extent of Petitioner's treating relationship with Dr. Brinkley. (R. 44, 48, 474, 666–67.) The ALJ addressed the supportability and consistency factors by showing that Dr. Brinkley's medical opinion contradicted other medical record evidence. See supra pp. 12–13. By highlighting the lack of consistency between the medical record as a whole and Dr. Brinkley's medical opinion, the ALJ demonstrated a logical basis in accordance with SSA regulations for why he gave less weight to Dr. Brinkley's medical opinion than the state agency physicians' opinion. 20 C.F.R.

§ 416.927(c). As a result, the ALJ appropriately ascribed greater weight to the state agency consultants' opinion than Dr. Brinkley's opinion on Petitioner's mental RFC.

Substantial evidence supports the ALJ's weighing of the medical opinions, which, in turn, supports the RFC he derived from the medical opinions. Consol. Edison, 305 U.S. at 229; Richardson, 402 U.S. at 401; see supra 12–14. The VE determined that Petitioner could work as an addresser, document preparer, or glass waxer using the properly derived RFC. (R. 50.) Substantial evidence, therefore, supports the ALJ's holding that Petitioner is not disabled. (R. 50.)[2]

## IV. Conclusion

Petitioner's motion for summary judgment (Docket No. 14) will be denied, the Commissioner's motion for summary judgment (Docket No. 18) will be granted, and the Commissioner's decision that Petitioner is not disabled will be affirmed. (R. 1, 36.)

Dated: August 21, 2017  /s/ Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

cc: All counsel of record

---

[2] Since the ALJ expressed an adequate basis for discounting Dr. Brinkley's medical opinion when the ALJ decided Petitioner's RFC, the Court need not consider whether the ALJ's references to Dr. Brinkley's overreliance on Petitioner's subjective complaints, Petitioner's objective of seeking benefits, and Petitioner's "sporadic and transitory" activities are cause for remanding this matter for further administrative proceedings. (Docket No. 15 at 5–7.)